IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 22-13822

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

JORDAN PATRICK LEAHY

Defendant-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA

INITIAL BRIEF OF APPELLANT LEAHY

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

Adeel Bashir, Esq.
Assistant Federal Defender
Senior Appellate Attorney
400 N. Tampa Street, Suite 2700
Tampa, FL 33602
Telephone: 813-228-2715
Facsimile: 813-228-2562
E-mail: adeel_bashir@fd.org

Appeal No. 22-13822

*United States of America v. Jordan Patrick Leahy*

## CERTIFICATE OF INTERESTED PERSONS

The people listed below have an interest in the outcome:

Barber, The Honorable Thomas P.,

Bashir, Adeel

Bernstein, Laura-Kate

Burden, Adrian

Clarke, Kristen,

Corrigan, The Honorable Timothy J.

Flynn, Erin H.

Foster, Sydney A.R.

Gammons, Carlton Curtiss

Hall, A. Fitzgerald

Handberg, Roger Bernard, III

Hoppmann, Karin

Huck, The Honorable Paul C.

Lamar, Janea

Landes, Samuel

Appeal No. 22-13822

*United States of America v. Jordan Patrick Leahy*

**CERTIFICATE OF INTERESTED PERSONS** – *cont'd.*

Leahy, Jordan Patrick

McCoy, The Honorable Mac R.

Mieczkowski, Sara

Mizelle, The Honorable Kathryn Kimball

Reese, David

J.T., Victim

Tuite, The Honorable Christopher P.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Jordan Leahy requests oral argument for two reasons. First, the issue raised in this appeal about the constitutionality of 18 U.S.C. § 245(b)(2)(B), is an important question of first impression in this circuit involving Congress's authority under Section 2 of the Thirteenth Amendment. Given the lack of precedent, and because the question requires a textual and historical analysis of the Thirteenth Amendment, argument by counsel familiar with the facts and caselaw should aid the Court in resolving this issue.

Second, this appeal raises issues involving the district court's instructions to the jury, response to the jury's questions, and denial of Leahy's motion for a judgment of acquittal and a new trial. These issues are fact intensive and also lack clear precedent from this Court on the precise questions raised. As a result, argument by counsel would aid the Court in resolving these issues as well.

## TABLE OF CONTENTS

**Contents**                                                                    **Page**

Certificate of Interested Persons ...................................................................*C1 of 2*

Statement Regarding Oral Argument......................................................................i

Table of Contents...............................................................................................ii

Table of Citations ............................................................................................. v

Statement of Subject Matter and Appellate Jurisdiction....................................ix

Statement of the Issues..................................................................................... 1

Statement of the Case ...................................................................................... 2

    i.    Course of Proceedings and Disposition in the Court Below.................... 2

    ii.    Statement of the Facts ................................................................... 2

        a.  Offense conduct ................................................................ 2

        b.  Pretrial motions................................................................. 5

        c.  Trial proceedings and Rule 29 motion................................. 6

        d.  Closing arguments and jury instructions............................... 8

        e.  The jury's questions and verdict ........................................ 11

        f.  Post-trial motions and sentencing ...................................... 13

    iii.    Standards of Review...................................................................... 15

TABLE OF CONTENTS
*Continued*

**Contents**                                                                **Page**

Summary of the Argument .................................................................... 17

Arguments and Citations of Authority ............................................. 19

I.    Section 245(b)(2)(B) is Unconstitutional Under the Thirteenth Amendment Both Facially and As Applied to Leahy's Conduct. .......... 19

    a.  Congress's Authority Under the Thirteenth Amendment ................. 19

    b.  The *Civil Rights Cases* Provide the Proper Textual and Historical Framework for Assessing Congress's Authority Under Section 2 of the Thirteenth Amendment. ......................................... 24

    c.  *Jones* Conflicts with the Thirteenth Amendment's Text and History and the *Civil Rights Cases* .......................................... 27

    d.  *Jones* Conflicts with the Supreme Court's Interpretation of Analogous Reconstruction Era Amendments. ................................. 30

    e.  Section 245(b)(2)(B) is Unconstitutional under the *Civil Rights Cases* and *Jones.* ............................................................ 32

        i.   Section 245(b)(2)(B) does not combat a badge or incident of slavery, as those terms are understood historically under the *Civil Rights Cases.* ....................................... 32

        ii.  Section 245(b)(2)(B) fails under *Jones* whether applying a congruence and proportionality test or rational-basis review. .................................................................... 34

TABLE OF CONTENTS
*Continued*

**Contents**                                                                    **Page**

II.    The District Court Erred by Failing to Instruct the Jury on the Specific Intent to Deprive a Victim of the Use of a Public Facility, Declining to Instruct the Jury on the Theory of Defense, and Refusing to Answer the Jury's Question about Starkey Road. ............... 38

    a.  Section 245(b)(2)(B) Is Limited to Acts Against a Victim Based on a Victim's Membership in a Protected Category and on his/her Use of a Public Benefit or Facility. .......................................... 38

    b.  The District Court Should Have Instructed the Jury on Leahy's Theory of Defense that J.T.'s Use of Starkey Road Did Not Cause his Conduct. .................................................................. 40

    c.  The District Court Abused its Discretion by Refusing to Answer the Jury's Question about the Causal Connection between Leahy's Actions and Starkey Road. ....................................... 43

III.   The District Dourt Erred by Denying Leahy's Motions for Judgment of Acquittal and New Trial. ....................................................... 47

Conclusion. ................................................................................. 50

Certificate of Compliance. ............................................................ 51

Certificate of Service ................................................................... 51

TABLE OF CITATIONS

**Cases**                                                                                                                **Page(s)**

*Bailey v. State of Alabama*, 219 U.S. 219 (1911) ..................................................... 19

*Bollenbach v. United States,* 326 U.S. 607 (1946)..................................................... 43

*Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020) ..................................... 38

*City of Boerne v. Flores*, 521 U.S. 507 (1997)...................................................... 30, 32

*Civil Rights Cases*, 109 U.S. 3 (1883) ............................................................*passim*

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ............................. 30

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ............................................................. 35

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ...........................................*passim*

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ...................................... 24, 25

*Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117 (11th Cir. 2012) ............................. 46

*Ranch House, Inc. v. Amerson*, 238 F.3d 1273 (11th Cir. 2001) ............................. 15

*Runyon v. McCrary*, 427 U.S. 160 (1976).................................................................. 35

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013) ............................................. 31, 32

*Students for Fair Admissions, Inc. v.*
    *President & Fellows of Harvard Coll.*,
    143 S. Ct. 2141 (2023) ...................................................................................... 38

*Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167 (2009)............................................. 39

*United States v. Allen*, 341 F.3d 870, 883 (9th Cir. 2003)............................. 35, 36, 46

*United States v. Baston*, 818 F.3d 651 (11th Cir. 2016)........................................... 45

TABLE OF CITATIONS
*Continued*

**Cases**                                                                   **Page(s)**

*United States v. Bledsoe*, 728 F.2d 1094 (8th Cir. 1984).................................................... 35, 36

*United States v. Bowman*, 302 F.3d 1228 (11th Cir. 2002)................................................. 16

*United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022) ........................................................ 27

*United States v. Gumbs*, 964 F.3d 1340 (11th Cir. 2020) ................................................... 43

*United States v. Joyner*, 882 F.3d 1369 (11th Cir. 2018)..................................................... 43

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009) .................................................. 16, 43

*United States v. Martinez*, 763 F.2d 1297 (11th Cir. 1985).............................................. 16, 49

*United States v. Middleton,* 690 F.2d 820 (11th Cir. 1982)................................................. 41

*United States v. Morris,* 20 F.3d 1111 (11th Cir. 1994)....................................................... 16

*United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002)................................................... 35, 36, 39

*United States v. Opdahl*, 930 F.2d 1530 (11th Cir. 1991) ........................................ 16, 40, 41

*United States v. Roof*, 10 F.4th 314 (4th Cir. 2021)............................................................... 36

*United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995) ........................................................... 40

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ......................................... 38, 39

*United States v. Wright*, 392 F.3d 1269 (11th Cir. 2004)..................................................... 16

TABLE OF CITATIONS
*Continued*

**Constitutional Provisions**                                    **Page(s)**

U.S. Const. Art. 1, Sec. 8, cl. 18 ....................................................... 24

U.S. Const. amend. XIII ...................................................... *passim*

U.S. Const. amend. XIV ................................................ 30, 31, 32

U.S. Const. amend. XIV ................................................... 31, 32

**Statutes**

18 U.S.C. § 245(b)(2)(B) .................................................. *passim*

18 U.S.C. § 1581 .................................................................... 23

18 U.S.C. § 1584 .................................................................... 33

18 U.S.C. §§ 1585-1588 ...................................................... 33

18 U.S.C. § 1589 .................................................................... 33

18 U.S.C. § 1590 .................................................................... 33

18 U.S.C. § 1591 .................................................................... 33

18 U.S.C. § 3231 ..................................................................... ix

18 U.S.C. § 3742 ..................................................................... ix

28 U.S.C. § 1291 ..................................................................... ix

28 U.S.C. § 1294 ..................................................................... ix

42 U.S.C. § 1981 .................................................................... 35

42 U.SC. § 1982 ............................................................... 22, 24

42 U.S.C. § 1985 .................................................................... 35

TABLE OF CITATIONS
*Continued*

**Rules**                                                                 **Page(s)**

Fed. R. App. P. 32 ........................................................................... 51

Fed. R. Crim. P. 29 ........................................................................... 7

Fed. R. Crim. P. 33 ...................................................................... 13, 16

**Other Authorities**

Michelle Alexander, *The New Jim Crow:*
    *Mass Incarceration in the Age of Colorblindness* (2010) ...................... 29

Bouvier's Law Dictionary (7th Ed. 1867) ........................................... 26

Cong. Globe, 39th Cong., 1st Sess., 322 ............................................. 23

Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*,
    14 U. Pa. J. Const. L. 561 (2012) ................................................ 26

Jennifer Mason McAward, *McCulloch and the Thirteenth Amendment*,
    112 Colum. L. Rev. 1769 (2012) .................................................. 29

Jennifer Mason McAward, *The Scope of Congress's Thirteenth Amendment*
    *Enforcement Power After City of Boerne v. Flores*,
    88 Wash. U.L. Rev. 77 (2010) ................................................. 26, 27

### STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This is a direct appeal from the final judgment in a criminal case, entered by the United States District Court, Middle District of Florida, Tampa Division, on November 8, 2022. Doc. 104. The district court had original jurisdiction over this criminal case under 18 U.S.C. § 3231. Appellant/Defendant Jordan Leahy timely filed a notice of appeal on November 9, 2023. Doc. 106. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUES

I.    Whether Section 245(b)(2)(B) is a constitutional exercise of Congress's authority under Section 2 of the Thirteenth Amendment.

II.   Whether the district court correctly instructed the jury that Leahy acted "because J.T. was enjoying the use of a facility provided by a state or local government; in this case, Starkey Road."

III.  Whether the district court erred by denying Leahy's theory of defense instruction that he "would have behaved in the same way he did on the night in question even if J.T. had not used Starkey Road," and by failing to respond to the jury's question about the causation requirement about Starkey Road.

IV.   Whether the government presented sufficient evidence to support that Leahy acted "because" of J.T.'s use of Starkey Road; and whether a new trial is warranted in any event.

1

## STATEMENT OF THE CASE

This case arises following an ugly episode instigated by Jordan Leahy, a white male, against J.T., a black male, while the two were driving on Starkey Road in Pinellas County, Florida. This appeal asks this Court to address Congress's authority under the Thirteenth Amendment to criminalize Leahy's admittedly-boorish conduct as a hate crime, under 18 U.S.C. § 245(b)(2)(B); whether the district court erred in its instructions to the jury about the government's burden to prove that Leahy targeted J.T. "because" of J.T.'s use of Starkey Road and in its response to the jury's question about that burden; and whether the district court erred in denying Leahy's motion for a judgment of acquittal and a new trial based on the Starkey Road causation requirement.

### i.   Course of Proceedings and Disposition in the Court Below

By an indictment, the government charged Leahy with two counts of interfering with federally-protected activities, in violation of Section 245(b)(2)(B). Doc. 1. A jury convicted Leahy of count one, but found him not guilty of count two. Doc. 86 at 25. The district court sentenced Leahy to twenty-four months' imprisonment, to be followed by a thirty-six-month term of supervised release. Doc. 104. This appeal follows. Leahy is incarcerated pursuant to this judgment.

### ii.   Statement of the Facts

#### a.   Offense conduct

Starkey Road is a publicly-maintained road in Pinellas County, Florida. Doc. 84 at 145-46. One evening, J.T., his girlfriend, and his four-year-old daughter were driving

southbound on Starkey Road, which was largely empty. *Id.* at 36. Leahy pulled alongside J.T. just a little past the Ulmerton Road intersection and began pointing at J.T.'s car. *Id.* at 38. J.T. rolled down his window and heard Leahy shouting racial slurs at him, such as "f–k you n—er." *Id.* at 40.

Trying to avoid a conflict, J.T. rolled up his window and sped up. *Id.* at 40-43. But Leahy tailgated him and sideswiped J.T.'s car, veering J.T. off the road. *Id.* at 43. So J.T. tried a different tactic to get away from Leahy. *Id.* He slowed down and pulled over to let Leahy pass by. *Id.* at 44-48. J.T. also took a picture of Leahy's license plate so he could report him to the police. *Id.* at 44-48.

Unfortunately, J.T.'s plan didn't work out quite as he hoped. *Id.* at 48. Leahy stopped at the next intersection at Brian Dairy Road (which is about two miles past Ulmerton Road), got out of his vehicle, and walked toward J.T.'s car. *Id.* at 50-51. Fearing that Leahy might attack his vehicle and harm his girlfriend or daughter, J.T. also got out of his car and walked toward Leahy. *Id.*



Doc. 82-9.

As the two approached each other, Leahy continued to shout racial slurs at J.T. Doc. 84 at 48-51. Then Leahy tried to punch J.T. *Id.* But J.T., a former personal trainer and fight coach, avoided the hit; instead, J.T. hit Leahy twice, put him in a chokehold, and laid him unconscious on the ground. *Id.* at 33, 50-51. J.T. sensed Leahy was drunk and kept him restrained until Leahy woke up. *Id.* at 54-55; 117, 138.

J.T.'s girlfriend called 911, reporting: "This dude just hit our car, sideswiped us, called us 'n—rs,' and then he tried to fight my boyfriend." Doc. 82-1; Doc. 84 at 82-86. When the police arrived, Leahy falsely claimed that he "was driving and [when he] [ ] stopped at this red light and this dude pulled [him] [ ] out of [ ] [his] car and started choking [him] [ ]." Doc. 82-6. He made other comments while in custody like, "damn,

I wish I had money. If I had money I wouldn't have been out here f—kin fighting with random dudes in a f—king, in a car, drunk." Doc. 78-2.

Leahy also made several disparaging remarks about black people. Docs. 82-2 – 82-8. Among those comments, he told the police "these guys," meaning black people, "are animals," and "y'all have to maintain these people, keep them in their, in their areas." Doc. 82-2.

The government charged Leahy with two counts of violating §§ 245(b)(2)(B) following this incident: count one was for Leahy's conduct while in his vehicle, and count two concerned Leahy's actions after he exited his car. Doc. 1. Both counts alleged Leahy "using force and threat of force," willfully intimidated and tried to injure J.T. "because of J.T.'s race and color, and because J.T. was enjoying a facility provided and administered by the State of Florida and its subdivision, that is, Starkey Road." *Id.*

### b. Pretrial motions

Leahy moved to dismiss the indictment, arguing that Section 245(b)(2)(B) exceeds Congress's authority under Section 2 of the Thirteenth Amendment, both facially and as applied to him. *See* Doc. 20. But the district court denied the motion, concluding that Section 245(b)(2)(B) is within Congress's authority under the Thirteenth Amendment. Doc. 36.

Leahy later objected to the government's proposed jury instruction on Section 245(b)(2)(B)'s element about Starkey Road, contending that it was "an incorrect statement of the law," because it called for a "but-for caution" test. Doc. 113 at 58.

Leahy explained the "because" language relating to the Starkey Road element required "an intent to retaliate or an intent to dissuade… [a] victim's use of the publicly administered road or he intended to dissuade the victim from using the road in the future." *Id.* at 59. The district court, however, disagreed, opting "to go essentially with the Government's proposal" "to use a but-for" causation instruction to make the Starkey Road element instruction "parallel" the third element on acting "because of" a victim's race. Doc. 114 at 9-10.

### c. Trial proceedings and Rule 29 motion

At trial, there was no serious dispute that the evidence satisfied the first three elements of Section 245(b)(2)(B). Thus, Leahy's defense mainly focused on Section 245(b)(2)(B)'s fourth element—whether the evidence showed Leahy acted "because" J.T. used "Starkey Road." Doc. 1.

Witnesses confirmed that Leahy said nothing about Starkey Road before, during, or after his altercation with J.T. *See* Doc. 84 at 67, 90, 99, 117, 128, 139. For example, when asked by the defense if Leahy said "black people don't belong" on Starkey Road, or Starkey Road is for white people, J.T. responded, "No." *Id.* at 67. Likewise, J.T.'s girlfriend testified on cross-examination she did not hear Leahy mention anything about Starkey Road. *Id.* at 90. And the responding officers and Leahy's ex-girlfriend, who testified for the government, all testified that Leahy said nothing about Starkey Road, in the past or on that evening, including keeping black people or J.T. from using Starkey Road. *Id.* at 117, 128, 139.

In response to the defense's line of questioning on Starkey Road, the government introduced evidence of Leahy's statement to the police: "You know, these -- these guys," meaning black people, "are animals, you know what I'm saying? Y'all have to maintain these people, keep them in their, in their areas." Doc. 82-2; Doc. 84 at 119.

At the close of evidence, Leahy repeated the defense's position that Section 245(b)(2)(B) calls for "a specific intent requirement, the intent to punish or prevent or dissuade the victim from using the public facility." *Id.* While acknowledging the defense's position as "a close question" that might "take the Eleventh Circuit or maybe the Supreme Court to resolve," the district court again rejected the proposed instruction. Doc. 84 at 166-67.

> Leahy also asked for a theory of defense instruction:
>
> It is the Defense's theory that the defendant would have behaved in the same way he did on the night in question even if J.T. had not used Starkey Road. If you find that the Government has failed to prove beyond a reasonable doubt that the defendant acted "because of" J.T.'s use of Starkey Road – that is, that he would not have acted as he did in the absence of J.T.'s use of Starkey Road – then you must find the defendant not guilty.

Doc. 69; Doc. 84 at 167. But the district court denied the instruction, reasoning that it attempted to inject the specific intent requirement the court rejected. *Id.*

Leahy additionally moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. *Id.*; Doc. 70. He argued "no rational jury could accept the evidence…and conclude beyond a reasonable doubt that Jordan Leahy did what he did that night because of, even on a but-for causation, standard because of [ ] [J.T.'s] use of

7

Starkey Road." Doc. 84 at 167. In support, he explained "[t]here's been no evidence" of Leahy's intent "that he was exclusively looking for victims on Starkey Road." *Id.* Thus, a judgment of acquittal was justified because "[t]here's just been no evidence that [Leahy's] [ ] motivation for…his behavior that night had anything to do with Starkey Road." *Id.*

The district court recognized this was "not a real, real strong case." *Id.* at 168. But the court pointed to evidence that Leahy "wanted to keep them, referring to blacks, in their area, which…the result of that would be they wouldn't be using Starkey Road." *Id.* The court reasoned this evidence "probably gets [ ] [the government] over the hump." *Id.* So although the court believed "it's one of those close questions because it's kind of a unique application of the statute," it determined the "jury could conclude" from Leahy's statement that he "wanted to keep the blacks in their area" that Leahy "conversely [ ] want[ed] to keep" black people like J.T. "out of places other than their area," like "public highways including Starkey Road." *Id.* at 169-70; Doc. 71.

**d. Closing arguments and jury instructions**

During closing arguments, the government directly addressed that "one of the questions that's been asked by defense counsel several times [was] about whether the Defendant mentioned Starkey Road when he was being interviewed by law enforcement officers." Doc. 84 at 182. Over Leahy's objection, the government told the jury "that is not the question that you have to answer today." *Id.* Rather, the "question is would this crime have happened in the way that it did without [ ] [J.T.'s] use of Starkey Road." *Id.*

8

The government emphasized that "this entire crime occurred on Starkey Road. From Ulmerton to Bryan Dairy, the entire crime occurred on Starkey Road." *Id.* at 183. Thus, the government argued, "[i]f you take Starkey Road out of it, this crime does not occur." *Id.*

In response, Leahy argued that the "Government was supposed to prove to you beyond a reasonable doubt that Jordan Leahy did what he did because [ ] [J.T.] was using Starkey Road." *Id.* at 185. But the evidence "did nothing of the sort because Jordan Leahy didn't care that [ ] [J.T.] was using Starkey Road." *Id.* at 186-86. Rather, the evidence showed that Leahy was "driving around drunk looking for someone to mess with." *Id.* at 186. Further, Leahy argued he didn't interfere with J.T.'s use of Starkey Road because he drove past J.T. and left him "[o]n Starkey Road right where he started in the left turn lane." *Id.*

As to evidence about Leahy's statement to the police about keeping black people in their areas, the defense contended this evidence "has nothing to do with Starkey Road." *Id.* at 187. Leahy posited that if the facts changed and "it's not Starkey Road," but he encountered J.T. "on Ulmerton Road," "[e]xactly the same thing that happened in this case" would have happened. *Id.* at 188-89. And that is because, the defense argued, Leahy "didn't care" that J.T. was using Starkey Road. *Id.* at 189.

On rebuttal, however, the government pushed back on it being "required to prove it was the use of Starkey Road." *Id.* at 193-94. Instead, the government said it was

required to prove "just a road." *Id.* at 194. But Leahy objected to this argument, pointing out that "[t]he Indictment states Starkey Road." *Id.*

Even so, the government highlighted Leahy's comments to the police about keeping black people in their areas. *Id.* at 197. The government's rebuttal stressed:

> If you keep them in some areas necessarily means you keep Black Americans away from other areas. You keep them in their areas, it means you keep them out of here. You keep them in their areas, you keep them away from the Defendant's area, because that night behind the wheel of that champagne-colored older Toyota Camry, was Starkey Road. Ladies and gentlemen, the law protects the right of everyone, everyone, to drive down public streets. Whether Starkey Road, whether any other street…

*Id.*

After closing arguments, the government "request[ed] an instruction that provide[d] that [ ] [it] need not prove the use of Starkey Road specifically, so long as the Government has established that J.T.'s use of a public facility was a but-for cause of the Defendant's conduct." *Id.* at 206. Leahy objected to such an instruction, explaining this would be "a constructive amendment to the indictment." *Id.* at 207.

The district court denied the government's request. *Id.* The court "tend[ed] to agree with the Government's interpretation," and questioned why the indictment "was [written] that way, dash Starkey Road." *Id.* But the court explained, if "the jury…c[a]me back with a jury question, which could possibly be the case, we will deal with it then." *Id.*

For its part, the defense again asked for its theory of defense instruction, (*id.* at 208), which the defense argued adhered to "a but-for causation element." *Id.* at 209.

10

The defense explained its theory was "Leahy would have behaved in the same way even if [J.T.] was not driving on – or using Starkey Road." *Id.* at 210. The district court, however, denied the theory of defense instruction, disagreeing with the defense that this theory accurately reflected the law. *Id.* at 211.

Thus, the district court instructed the jury that for it to find Leahy acted "because J.T. was enjoying the use of a facility provided by a state or local government; in this case, Starkey Road," it had to determine:

> [T]hat the Defendant would not have acted as he did but-for J.T.'s use of that facility. J.T.'s use of a public facility need not be the only cause for the Defendant's action. Thus, you may find this element is satisfied even if the Defendant had additional reasons for his actions so long as you find that the Defendant would not have acted as he did in the absence of J.T.'s use of that facility.

Doc. 77; Doc. 85 at 20.

### e. The jury's questions and verdict

The jury asked several questions during its deliberations. *See* Doc. 76. Most pertinent, the jury asked, "[w]e are not unanimous on count one. Do we proceed with count two." *Id.* at 3. The district court answered the jury, "yes," and instructed them, "[p]lease continue in your deliberations." Doc. 86 at 7. [1]

Shortly after, the jury returned with another question: "[w]e are not unanimous on neither [sic] count one or count two. Please advise." Doc. 76 at 4. At the agreement

---

[1] Due to scheduling issues, three different district judges handled Leahy's proceedings. The district judge who responded to the jury's questions did not preside over Leahy's trial, and he did not handle Leahy's case pre- or post- trial. *See* Doc. 85 at 30-31.

of both parties, the court gave the jury question a modified *Allen* charge. Doc. 86 at 8-10.

About another half hour passed and the jury came back with one more question: "[d]oes the fact that both parties were on the road at the same time suffice part four of [the] charges?" Doc. 76 at 5; Doc. 86 at 11. The district court said the question "doesn't sound like one we can answer as far as I'm concerned." *Id.* Defense counsel, however, said "[i]f we read the question to be is that by itself, the fact that they are both on the road, sufficient to prove beyond a reasonable doubt element four, the answer is no." *Id.* But while the court recognized that "no" "might be" the correct answer, it reasoned "we can't answer the question" because "they are asking us to answer what they have been asked to answer." *Id.* Still, the defense maintained the jury's question posed facts that "would be insufficient as a matter of law." *Id.*

The district court expressed another concern that "even if we wanted to try to answer [ ] [the question], we are assuming that the question is asking something that we think it's asking, but I don't know if that's the way they are viewing it." *Id.* Defense counsel suggested giving "alternative answers," if the court was unsure about the jury's question, but insisted "if the question is, as I think it is, the answer is no as a matter of law." *Id.* at 12.

The court suggested telling the jury "something like, the question as you have phrased it, we cannot answer, but if you want to try to formulate a more detailed question, we might be able to answer that?" *Id.* at 13. Defense counsel explained, "the

12

only way I think that could be fruitful is to sort of point them in the right direction by prompting them to ask it again in a way that shows us that they are asking if the fact that they were both driving on the road by itself suffices to prove element four, because the answer -- the answer as a matter of law to that is no." *Id.* However, once the court indicated its unwillingness to answer the jury's question, and over his preferred response, defense counsel recognized that telling jury to "ask a more detailed question" might be "worth a try." *Id.* at 14.

Thus, the district court responded to the jury's question:

> We have been able to answer your questions so far, but this particular question, as phrased, we cannot answer; however, if you are able to formulate a different or more detailed question on this point, we can take a look at it and see if we can answer that question. But the one that you have phrased here, we cannot answer.

*Id.* at 16.

The jury did not follow up with a more detailed question. Rather, about a half hour after the court's response, the jury found Leahy guilty on count one, but not guilty on count two. *Id.* at 23-25.

### f.  Post-trial motions and sentencing

Leahy moved for a new trial under Federal Rule of Criminal Procedure 33. Doc. 89. He argued a new trial was warranted because (1) the government "presented no evidence whatsoever that Leahy was exclusively seeking out victims on Starkey Road"; (2) the district court "declined to instruct the jury as to Leahy's theory of defense"; and (3) after being deadlocked, the jury "proposed a fact pattern and asked whether that

fact pattern would be sufficient for a finding of guilt. The fact pattern was legally insufficient to prove Leahy's guilt under any competing understanding of the law, and Leahy's proposed theory of defense instruction would have helped to clear that up." *Id.* at 2. But the court 'declined to answer the jury's question at all." *Id.* Thus, Leahy argued, these errors "considered alone or together," justified a new trial. *Id.*

The district court denied the motion. Doc. 93. First, the court concluded Leahy's statement to the police about keeping black people in their areas, with evidence of how Leahy attacked J.T., was "sufficient for the jury to reasonably find beyond a reasonable doubt that the Defendant attacked the victim because he was driving along Starkey Road." *Id.* at 3. Second, on Leahy's proposed theory-of-defense instruction, the court explained it "was rejected because it was, in the Court's view, inconsistent with the version of the 'because of' definition ultimately selected" and that the "Defendant's proposed instructions would not only have been inconsistent and confusing, but a misstatement of the law." *Id.* at 4. Third, the court explained that the response to the jury's question about the evidence on Starkey Road "was appropriate…because of the specific wording [of the jury's question], the Court felt a definitive response was inappropriate, and, in the Court's view, likely misleading given the nature of the fact and legal issues presented." *Id.* at 5. In a later order, the district court also denied Leahy's motion for reconsideration. *See* Doc. 94; Doc. 102; Doc. 115 at 4.

Before sentencing, U.S. Probation issued a presentence investigation report, which calculated Leahy's advisory sentencing guideline range based on a total offense

level 21, criminal history category IV, resulting in a 57- to 71-month range of imprisonment. Doc. 98 (PSR) at ¶¶ 20-27, 35, 86. Leahy, among other objections, disagreed with the PSR's assignment of a base offense level corresponding to an aggravated assault. *See* PSR Addendum. He argued there was no evidence that Leahy intended to harm J.T. with his car; instead, the evidence established only that he tried to frighten J.T. *See id.* The district court agreed, finding that as "obnoxious and downright evil" Leahy's actions were, there was no "intent to cause bodily injury," but "it was more of an attempt to intimidate J.T." Doc. 115 at 7. The court reasoned that "if [ ] [ Leahy] really intended to knock J.T. or the victim's automobile off the road he would have done" so. *Id.* Thus, the court determined there was no intent "to cause bodily injury," "knock the car off the road," or "side swipe it off the road." *Id.* at 8. As a result, the court "sustain[ed] the objection," recalculating Leahy's guideline range at 24 to 30 months' imprisonment. *Id.*; *see also id.* at 15. After hearing the parties' arguments and Leahy's allocution, (*id.* at 17-29), the district court sentenced Leahy to 24 months' imprisonment, followed by three years ofn supervised release. *Id.* at 30, 33.

### iii.   Standards of Review

Several standards of review govern this appeal. First, the "constitutionality of a statute is a question of law subject to de novo review." *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1277 (11th Cir. 2001).

Second, the correctness of jury instructions is also reviewed de novo to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party. *See United States v. Lopez*, 590 F.3d 1238, 1248 n.7 (11th Cir. 2009).

Third, this Court reviews the district court's refusal to give a requested jury instruction, including a theory-of-defense instruction, for an abuse of discretion. *See United States v. Morris*, 20 F.3d 1111, 1114 (11th Cir. 1994); *United States v. Opdahl*, 930 F.2d 1530 (11th Cir. 1991).

Fourth, this Court reviews a district court's response to a jury question for an abuse of discretion. *See United States v. Wright*, 392 F.3d 1269, 1279 (11th Cir. 2004).

Fifth, a district court's denial of a motion for judgment of acquittal is reviewed de novo, drawing all reasonable inferences in the government's favor. *See United States v. Bowman*, 302 F.3d 1228, 1237 (11th Cir. 2002).

Finally, this Court reviews for abuse of discretion the district court's denial of a defendant's Rule 33 motion for a new trial. *See United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir. 1985).

## SUMMARY OF THE ARGUMENT

Constitutional text, history, and precedent show that Section 245(b)(2)(B)'s prohibition against injuring, intimidating or interfering with a person based on racial animus and because of that person's use of a public facility is an unconstitutional exercise of Congress's authority under Section 2 of the Thirteenth Amendment. Facially, the statute does not target conduct fairly considered as a badge or incident of slavery. Section 245(b)(2)(B)'s reach is therefore too far attenuated from conduct that *prevents* or *denies* a person a fundamental freedom because of his/her race. And as applied, there is no evidence that Leahy sought to deny J.T. the use or enjoyment of a fundamental right.

Should the Court find that the statute passes constitutional muster, it should read Section 245(b)(2)(B) narrowly to require an intent to deprive a victim the right to enjoy a public facility or benefit. Even still, the district court erred by refusing to instruct the jury on Leahy's theory of defense because his defense fit a "but-for" standard. And likewise, the court erred by refusing to answer the jury's question about "the fact that both parties were on the road at the same time" because the jury's factual scenario does not meet "but-for" causation as a matter of law.

Nevertheless, there was no evidence that Leahy was motivated by J.T.'s use of Starkey Road, or that Leahy's conduct that night had anything to do with preventing J.T. from using a public facility other than the happenstance of both men being on the road at the same time. That is not enough to support the causation requirement for the

17

fourth element, thus requiring a judgment of acquittal. At the very least, the district court should have granted Leahy's motion for a new trial given the overwhelming confusion about both the government's burden and evidence involving whether Leahy acted "because" of J.T.'s use of Starkey Road.

ARGUMENTS AND CITATIONS OF AUTHORITY

**I.    Section 245(b)(2)(B) is Unconstitutional Under the Thirteenth Amendment Both Facially and As Applied to Leahy's Conduct.**

### a.  Congress's Authority Under the Thirteenth Amendment.

Introduced during the Civil War, and ratified after the war, the Thirteenth Amendment to the Constitution famously abolished slavery in the United States. For all its notoriety, however, the Thirteenth Amendment's proper scope and reach have received little in-depth analysis from the Supreme Court.

The amendment's two sections provide the foundation for passing federal laws designed to protect individuals from laws and practices that deprive them of their civil liberties.

Section 1 provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend XIII, § 1. This provision "reproduced the historic[ ] words" of the Northwest Ordinance of 1787, which was widely viewed as "a charter of universal civil freedom for all persons, of whatever race, color, or estate, under the flag." *Bailey v. State of Alabama*, 219 U.S. 219, 241 (1911). By using language with historic meaning, the Thirteenth Amendment framers made their "plain intention" "to abolish slavery of whatever name and form and all its badges and incidents." *Id.*

Section 2 grants Congress the right to pass legislation to enforce the abolition of slavery and involuntary servitude, with its badges and incidents. This provision states:

19

"Congress shall have power to enforce this article by appropriate legislation." U.S. Const. amend. XIII, § 2.

Judicial review discussing the relationship between Sections 1 and 2 traces its roots to the *Civil Rights Cases* of 1883. There, the Supreme Court explained that while Section 1 "[b]y its own unaided force [ ] abolished slavery, and established universal freedom," Section 2 gave Congress the authority to enact legislation that "may be necessary and proper to meet all the various cases and circumstances" to fulfill Section 1's goal. *C.R. Cases*, 109 U.S. 3, 20 (1883). Thus, the Court confirmed that Section 2's "appropriate legislation" power gave Congress the authority "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Id.*

At issue in the *Civil Rights Cases* was the constitutionality of a law passed as part of the Civil Rights Act of 1875 that made it an offense to deny people equal accommodations and privileges in all inns, public conveyances, and places of public amusement. *See id.* "Conceding" that Section 2 gave "Congress [ ] [the] right to enact all necessary and proper laws for the obliteration and prevention of slavery, with all its badges and incidents," the Court examined whether "the denial to any person of admission to the accommodations and privileges of an inn, a public conveyance, or a theater…subject that person to any form of servitude, or tend to fasten upon him any badge [or incident] of slavery." *Id.* at 20–21.

In undertaking this inquiry, the Court first addressed the meaning of badges and incidents of slavery, explaining that the "long existence of African slavery in this country

gave us very distinct notions of what it was, and what were its necessary incidents." *Id.* at 22. As examples, the Court listed "[c]ompulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities…." *Id.*

Looking additionally to historical evidence of contemporaneous legislation passed in the wake of the Thirteenth Amendment, the Civil Rights Bill of 1866, the Court determined that Congress's purpose behind the Thirteenth Amendment was to "secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens." *Id.* So from this historical evidence, the Court found that Congress's authority under Thirteenth Amendment extended "only to declare and vindicate those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery." *Id.*

After detailing these incidents of slavery and fundamental freedoms that the Thirteenth Amendment secured, the Court asked, "whether the refusal to any persons of the accommodations of an inn, or a public conveyance, or a place of public amusement, by an individual…inflict[s] upon such persons any manner of servitude, or form of slavery, as those terms are understood in this country?" *Id.* at 23. Also, accepting

21

"for the sake of the argument, that the admission to an inn, a public conveyance, or a place of public amusement, on equal terms with all other citizens, is the right of every man and all classes of men," the Court asked whether "the act of a mere individual, the owner of the inn, the public conveyance, or place of amusement, refusing the accommodation, be justly regarded as imposing any badge of slavery or servitude upon the applicant." *Id.* at 24.

"After giving to these questions all the consideration which their importance demands," the Court was "forced to the conclusion that such an act of refusal has nothing to do with slavery or involuntary servitude, and that if it is violative of any right of the party, his redress is to be sought under the laws of the State." *Id.* Central to its holding was the Court's finding that "[m]ere discriminations on account of race or color were not regarded as badges of slavery." *Id.* at 25. The Court therefore found the law unconstitutional under the Thirteenth Amendment. *See id.*

Nearly three-quarters of a century later, the Court returned in *Jones v. Alfred H. Mayer Co.* for its next major decision addressing Congress's Section 2 authority. *See* 392 U.S. 409 (1968). *Jones* involved a challenge to 42 U.S.C. § 1982, originally passed as a provision of the Civil Rights Act of 1866, which forbade racial discrimination in the lease and sale of private property. *Id.* at 412.

"The constitutional question" in *Jones* was whether "the authority of Congress to enforce the Thirteenth Amendment 'by appropriate legislation' include[s] the power to

22

eliminate all racial barriers to the acquisition of real and personal property?" *Id.* at 439. The *Jones* Court said, "the answer to that question is plainly yes." *Id.*

As support, the *Jones* Court affirmed the *Civil Rights Cases'* basic proposition that Section 2 "empower[s] Congress to do much more" than the abolition of slavery as provided in Section 1, extending to the eradication of the badges and incidents of slavery. *Id.* The *Jones* Court also affirmed that "whatever else they may have encompassed, the badges and incidents of slavery—its 'burdens and disabilities'— included restraints upon 'those fundamental rights which are the essence of civil freedom, namely, the same right…to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.'" *Id.* at 440-41 (quoting *C. R. Cases*, 109 U.S. at 22).

But the *Jones* Court turned to legislative history to expand upon Congress's authority under Section 2 to define the badges and incidents of slavery itself. *See id.* The *Jones* Court zeroed in on statements made by Senator Lyman Trumbull, then-Chairman of the Judiciary Committee and co-author of the Thirteenth Amendment, while he "defend[ed] the constitutionality of the 1866 Act" and argu[ed] against a "narrower construction of the Enabling Clause." *Id.* at 440. Senator Trumbull claimed that Congress had the authority "to decide what that appropriate legislation" under Section 2 was, and "to adopt such appropriate legislation as it may think proper." *Id.* (quoting Cong. Globe, 39th Cong., 1st Sess., 322) (statement of Sen. Trumbull)).

Declaring that "[s]urely Senator Trumbull was right," the *Jones* Court presumed and accepted that "Congress has the power under the Thirteenth Amendment rationally

to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." *Id.* Based on that determination, and applying its rational-basis test to Section 1982, the *Jones* Court determined it was not "irrational" for Congress to conclude that discrimination in the lease and sale of private property was a badge or incident of slavery. *Id.* at 440-41. *Jones* therefore held that Section 1982 was a proper exercise of Congress's Section 2 authority.

> **b. The *Civil Rights Cases* Provide the Proper Textual and Historical Framework for Assessing Congress's Authority Under Section 2 of the Thirteenth Amendment.**

The text and history of the Thirteenth Amendment shows that the *Civil Rights Cases*, the earlier of the Supreme Court's two major decisions interpreting the amendment, provides the correct framework for assessing the constitutionality of a statute under Section 2.

Beginning with the Thirteenth Amendment's text, the operative phrase in Section 2 is Congress's ability to enact "appropriate legislation" to enforce the amendment. The phrase "appropriate legislation" is closely analogous to the language of the Necessary and Proper Clause, which gives Congress the power to make "all Laws which shall be necessary and proper for carrying into Execution" of other listed federal powers. U.S. Const. Art. 1, Sec. 8, Cl. 18.

As the Court held in *McCulloch v. Maryland*, "necessary" does not mean "indispensable." 17 U.S. (4 Wheat.) 316, 413 (1819). Rather, to "employ the means necessary to an end, is generally understood as employing any means calculated to

produce the end, and not as being confined to those single means, without which the end would be entirely unattainable." *Id.* at 413–414. Thus, *McCulloch* held that "[l]et the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id.* at 421.

By analogy, Section 2's "appropriate legislation" language empowers Congress with at least as much authority as would be "necessary" to enforce Section 1's prohibition on slavery and involuntary servitude, complete with its badges and incidents. Applying *McCulloch*'s reasoning thus gives Congress latitude to enact "appropriate legislation" under Section 2 to abolish slavery and its badges and incidents. And this inquiry requires courts first to identify the badges and incidents of slavery, and then evaluate whether Congress's choice is a proper means to eliminate that end.

Critically, it is the court's role to identify the badge or incident of slavery that is the "end" in a Section 2 inquiry, just as it is the court's role to identify the listed congressional authority as the "end" in a necessary-and-proper analysis. This is the approach the *Civil Rights Cases* took. There, the Court engaged in historical analysis, looking to the "long existence of African slavery in this country" to identify "distinct notions of what it was, and what were its necessary incidents." 109 U.S. at 22. Based on that history, the Court provided discrete examples of badges and incidents of slavery, including compulsory service, restraint of movements, inability to hold property, enter into contracts, and access to the courts. *See id.* But the Court held, "[m]ere

discriminations on account of race or color were not regarded as badges of slavery." *Id.* at 25.

The *Civil Rights Cases*' conclusion about the meaning of badges and incidents align with the historical understanding of those terms. An incident of slavery, as that term was used in antebellum commentary, "was any legal right or restriction that necessarily accompanied the institution of slavery," particularly "the aspects of property law that applied to the ownership and transfer of slaves" and "the civil disabilities imposed on slaves by virtue of their status as property." Jennifer Mason McAward, *Defining the Badges and Incidents of Slavery*, 14 U. Pa. J. Const. L. 561, 575 (2012); *see also id.* at 570–71 & 571 n.38 (stating that, in 1867, an "incident" was defined as "[a] thing depending upon, appertaining to, or following another, called the principal") (citing Bouvier's Law Dictionary (7th ed. 1867)). A badge of slavery "[i]n its most general sense…refers to indicators, physical or otherwise, of African Americans' slave or subordinate status." *Id.* at 575.

So, from both history and the *Civil Rights Cases*' analysis, Congress's Section 2 authority extends to enacting legislation to eliminate the badges and incidents of slavery. But Congress is not free to redefine the meaning of badges and incidents itself. Instead, "to constitute an adequate limitation on Congress's power, the 'badges and incidents of slavery' must be understood as a term of art with a finite range of meaning that is tied closely to the core aspects of the slave system and its aftermath." Jennifer Mason

McAward, *The Scope of Congress's Thirteenth Amendment Enforcement Power After City of Boerne v. Flores*, 88 Wash. U.L. Rev. 77, 142 (2010).

This Court should conclude, as the *Civil Rights Cases* held, that badges and incidents of slavery are distinct, historical terms that consist of the denial of "those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery." 109 U.S. at 22. And the Court should find that the inquiry into whether Congress has enacted "appropriate legislation" under Section 2 is to examine whether a statute aims to combat the deprivation of a fundamental right, as the Court did so in the *Civil Rights Cases*.

> ### c. *Jones* Conflicts with the Thirteenth Amendment's Text and History and the *Civil Rights Cases*.

To be sure, the prevailing view among courts is that *Jones* governs the analysis for Congress's Section 2 authority. And under *Jones*, "so long as Congress rationally determines that conduct is a 'badge' or 'incident' of slavery, statutes passed in reliance on Congress's [Section] [ ] 2 authority pass constitutional muster." *United States v. Diggins*, 36 F.4th 302, 308 (1st Cir. 2022) (quoting *Jones*, 392 U.S. at 440); *see also* Doc. 36 at 5 (collecting cases).

But *Jones*'s analysis adheres to neither Section 2's text, history, nor the *Civil Rights Cases*. Although *Jones* did not overrule the *Civil Rights Cases* (*Jones* cites the *Civil Rights Cases* approvingly), there is a clear tension between the modes of analysis contained in the two decisions. But the decisions also share some common ground. Both decisions

support that Section 2's "appropriate legislation" language gives Congress the power "to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." *Compare C. R. Cases*, 109 U.S. at 20; *with Jones*, 392 U.S. at 439. And both decisions agree that "whatever else they may have encompassed, the badges and incidents of slavery—its 'burdens and disabilities'—included restraints upon 'those fundamental rights which are the essence of civil freedom, namely, the same right…to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.'" *Jones*, 392 U.S. at 440-41 (quoting *C. R. Cases*, 109 U.S. at 22).

Where the two decisions diverge is that the *Civil Rights Cases* undertook an historical inquiry to identify badges and incidents of slavery, as those terms were understood at the time of the Thirteenth Amendment's ratification, and then asked whether Congress's legislation targeted the infliction of those badges and incidents. *Jones*, however, turned to legislative history, relying on the remarks of Senator Trumbull to conclude that Congress had the ability both to define what are badges and incidents of slavery, subject only to rational basis review, and to enact legislation to eradicate those incidents, also subject only to the most deferential means-end scrutiny. *Compare* 109 U.S. at 22, *with* 392 U.S. at 440.

*Jones*'s two layers of deference - deferring to Congress's choices of both the ends and means under Section 2 - is one layer too many. Nowhere in the Thirteenth Amendment's text or the *Civil Rights Cases* is there support for granting Congress the ability to both define badges and incidents of slavery and choose the means to eliminate

them, all under a rational basis framework. Granting Congress such limitless authority would empower it to enact legislation combatting all forms of "mere discrimination" that are rationally related to the vestiges of slavery. That approach is not only inconsistent with the *Civil Rights Cases*, but it also has no principled limitation on the Thirteenth Amendment's scope.

To take a straightforward example, most scholars recognize that today's criminal justice system evidences racial disparities that stem from slavery. *See, e.g.*, Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2010). Under *Jones*'s logic, Congress could declare every racial disparity in our criminal justice system—and in our society —as a badge or incident of slavery, and those declarations could hardly be considered irrational. Congress could then enact a wide range of measures to criminalize conduct associated with eliminating those racial disparities and forms of discrimination, giving Congress nearly limitless authority to enact legislation targeting "hate speech, racial profiling, and disproportionate capital sentencing of black defendants, to violence against women, sexual harassment, and restrictions on reproductive rights." Jennifer Mason McAward, *McCulloch and the Thirteenth Amendment*, 112 Colum. L. Rev. 1769, 1770–71 (2012).

To be clear, racial discrimination has no place in our society and it is no doubt a laudable goal for our nation to eliminate in all its forms. But the question here is not about whether racial discrimination should exist—it should not; it is whether Congress has the power under Section 2 to eradicate every form of racial discrimination and racial

disparity by legislative decree. While the Thirteenth Amendment is an historic achievement that our nation should be proud of, it is not an all-powerful amendment that gave Congress the ability to criminalize all forms of racial discrimination and racial disparity.

*Jones* misstates that Congress can define the badges and incidents of slavery itself. This Court should follow the earlier, better-reasoned *Civil Rights Cases'* Thirteenth Amendment analysis, and conclude that *Jones*'s deferential framework is flawed.

### d. *Jones* Conflicts with the Supreme Court's Interpretation of Analogous Reconstruction Era Amendments.

If the Court concludes it is bound by *Jones*'s holding that Congress can define both the means and the end itself—determining what are badges and incidents of slavery and what legislation is appropriate to eliminate that end—the Supreme Court's more recent cases on the Reconstruction Amendments' enforcement clauses show that the congruence-and-proportionality test is truer to the Thirteenth Amendment's original public meaning. *Cf. Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2262 (2022) (explaining that "stare decisis is not an inexorable command, and it is at its weakest when we interpret the Constitution.") (cleaned up).

For example, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court considered whether the Religious Freedom Restoration Act (RFRA), as applied to state government action, exceeds Section 5 of the Fourteenth Amendment, which, like the Thirteenth Amendment, gives Congress the "power to enforce, by appropriate legislation," due process of law. U.S. Const. amend. XIV, § 5. If state action even

30

incidentally burdened a person's exercise of religion, RFRA required the state to show that its action was based on a compelling government interest and was the least restrictive means of achieving that interest. *See* 521 at 515-16.

The Court explained, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520. Applying this congruence-and-proportionality test to RFRA, the Court explained that the Free Exercise Clause protects against intentional discrimination against religion, but does not protect against incidental burdens on religion arising from neutral laws of general application. *See id.* at 529. Noting that RFRA's coverage includes incidental burdens on religion by neutral laws of general application, the Court held that "RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532.

The Court has taken a similar approach to the Fifteenth Amendment's enabling clause. *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013). There, the Court considered provisions of the Voting Rights Act that locked in place restrictions on certain states based on a formula from the 1960s. The Act singled out for federal control states that evidenced discriminatory voting practices then, but whose current data showed that voting practices had reached parity or better compared to states not under federal control. *See id.* at 548. The Court clarified that when the Voting Rights Act was originally

enacted, "the coverage formula–the means of linking the exercise of the unprecedented authority with the problem that warranted it–made sense." *Id.* at 546. The Court explained that the act must be "sufficiently related to its targeted problems" and "that current burdens must be justified by current needs," and held that the coverage formula exceeded Congress's power under the Fifteenth Amendment. *Id.* at 556.

*Flores* and *Shelby County* provide the relevant framework for Congress's exercise of power under Section 2 of the Thirteenth Amendment. *Flores* is of particular force given the identical "appropriate legislation" language used in Section 2 of the Thirteenth Amendment and Section 5 of the Fourteenth. Both provisions should be interpreted consistently, which calls for applying a congruence and proportionality test.

### e. Section 245(b)(2)(B) is Unconstitutional under the *Civil Rights Cases* and *Jones*.

#### i. Section 245(b)(2)(B) does not combat a badge or incident of slavery, as those terms are understood historically under the *Civil Rights Cases*.

Section 245(b)(2)(B) makes it a federal crime for any person "by force or threat of force" to "willfully injure[], intimidate[] or interfere[] with, or attempt[] to injure, intimidate or interfere with... any person because of his race… and because he is or has been… participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."

Applying the *Civil Rights Cases*' analysis, the question is whether "participating in or enjoying" a public facility is a fundamental freedom such that Congress's prohibition against willfully injuring, intimidating or interfering with a person because of his race,

and because he is or has been enjoying a public facility, is like eliminating a badge or incident of slavery. *See* 109 U.S. at 20-21. As the *Civil Rights Cases* outline, badges and incidents of slavery include acts such as compulsory service, restraint of movements, inability to hold property, enter into contracts, and access to the courts. *See id.* at 22.

Inflicting violence on a person or interfering with a person's use of a public facility is not of the same magnitude as these acts and cannot be "justly regarded as imposing any badge of slavery or servitude upon the applicant." *Id.* at 24. Rather, injuring, intimidating or interfering with a person based on racial animus and because of that person's use of a public facility are more like "[m]ere discriminations on account of race or color" that *Civil Rights Cases* held "were not regarded as badges of slavery." *Id.* at 25.

The important distinction is that Section 245(b)(2)(B) targets conduct *motivated* by a person's race and use of a public facility, which is altogether different than targeting conduct that *prevents* or *denies* a person a fundamental freedom because of his/her race. The latter category includes conduct such as forcing a person to do labor, restricting his/her freedom of movement or travel, or preventing him/her from entering into a contract, buying property, attending school, having children, or marrying. Thus, statutes that are appropriate exercises of Congress's Section 2 authority protect against conduct that closely corresponds to imposing a condition of involuntary servitude or a badges and incidents of slavery. *See, e.g.*, 18 U.S.C. § 1581 (2006) (criminalizing peonage); *id.* § 1584 (criminalizing involuntary servitude); *id.* §§ 1585-1588 (criminalizing slave trade);

*id.* § 1589 (criminalizing forced labor); *id.* § 1590 (criminalizing human trafficking); *id.* § 1591 (criminalizing sex trafficking).

But Section 245(b)(2)(B) does not require the government to prove that a perpetrator sought to deny a person a fundamental freedom. Even assuming the freedom to benefit from or enjoy a public facility is a fundamental freedom, Section 245(b)(2)(B), both facially and as applied here, only required the government to show that Leahy's conduct was *motivated* by J.T.'s race and use of a public facility, here, Starkey Road—not that he sought to prevent J.T. from using Starkey Road. Thus, the most that can be said about Leahy's admittedly-abhorrent behavior is that he engaged in racially-motivated violence, and interfered, temporarily, with J.T.'s use of Starkey Road. *See* Doc. 115 at 7-8 ("if [ ] [ Leahy] really intended to knock J.T. or the victim's automobile off the road he would have done" so); ("once the victim pulled off the left hand turn, [ ] [ Leahy] continued on"). But no evidence showed that Leahy intended to deny J.T. access to Starkey Road, any other road, or otherwise deny him the benefit of a fundamental freedom of traveling. Consequently, Section 245(b)(2)(B), both facially and as applied to Leahy, exceeds Congress's Section 2 authority.

ii.    **Section 245(b)(2)(B) fails under *Jones*, whether applying a congruence and proportionality test or rational-basis review.**

Shifting gears to the *Jones* analysis, Section 245(b)(2)(B) fails both the congruence and proportionality and rational-basis tests for similar reasons as discussed, *supra* Sec. I.E.i. Violence against, or interference with, a person motivated by that person's race

34

and use of a public facility is too far attenuated from the vestiges of slavery to be regarded as a badge or incident.

Consider the Supreme Court's application of *Jones* in other contexts. For example, in *Runyon v. McCrary*, the Court relied on *Jones* to uphold 42 U.S.C. § 1981's prohibition of racial discrimination in making and enforcing private contracts. *See* 427 U.S. 160, 168 (1976). Similarly, in *Griffin v. Breckenridge*, the Court applied *Jones* to uphold the constitutionality of 42 U.S.C. § 1985(3), which provides a statutory cause of action for black citizens "who have been the victims of conspiratorial, racially discriminatory private action aimed at depriving them of the basic rights that the law secures to all free men." 403 U.S. 88, 105 (1971). The commonality between these two decisions is that the Court found a rational relationship between the statute's aim and protecting a fundamental civil right—protecting the right to form a contract in *Runyon* and protecting the right to travel or use an interstate facility in *Griffin*.

Section 245(b)(2)(B), by comparison, does not protect a fundamental right. Once again, the statute criminalizes conduct *motivated* by racial animus and one's use of a public facility. But it does not require showing that a perpetrator sought to deny a victim any individual right.

To be fair, the Second, Eighth, and Ninth Circuits have held that Section 245(b)(2)(B) is a proper constitutional exercise of Congress's authority under Section 2 of the Thirteenth Amendment. *See United States v. Allen*, 341 F.3d 870, 883 (9th Cir. 2003); *United States v. Nelson*, 277 F.3d 164 (2d Cir. 2002); *United States v. Bledsoe*, 728

F.2d 1094 (8th Cir. 1984). The main reasoning by these courts is that Section 245(b)(2)(B) targets racially-motivated violence, and Congress could rationally determine that race-based violence is a badge and incident of slavery and that eliminating it is crucial to abolishing/eradicating/removing the remnants of slavery. *See Nelson*, 277 F.3d at 190 ("there exist[s] [an] indubitable connection[ ]…between American slavery and private violence directed against despised and enslaved groups"); *Bledsoe*, 728 F.2d at 1097 ("Nor can there be doubt that interfering with a person's use of a public park because he is black is a badge of slavery."); *Allen*, 341 F.3d at 885 ("The defendants forced the victims out of Pioneer Park through threats of force. This was a violation of the victims' federal civil rights"); *see also United States v. Roof*, 10 F.4th 314, 392 (4th Cir. 2021) (stating "emphatically that concluding there is a relationship between slavery and racial violence 'is not merely rational, but inescapable'" (quotation omitted)).

But there are two main problems with these courts' reasoning. First, saying there is an inescapable relationship between racial violence and slavery such that any form of racial violence is rationally considered as a badge or incident of slavery is an argument that proves too much. There is also an inescapable relationship between racial discrimination (or racial animus) and slavery since U.S. slavery subjected black people for hundreds of years in every part of society. Does that make all forms of racial discrimination or racial disparity that exist today badges and incidents of slavery? At a minimum, it is not any less rational to conclude racial discrimination or racial disparities are badges or incidents of slavery than it is to conclude that racial violence is one. So

36

declaring that racial violence is inescapably linked to a badge or incident of slavery, based on the blanket and uncontroversial assertion that black people suffered from violence during slavery, also means all forms of racial discrimination and racial disparity are badges and incidents of slavery. But that conclusion is impossible to square with the *Civil Rights Cases*' finding that "[m]ere discriminations on account of race or color were not regarded as badges of slavery." 109 U.S. at 25.

Second, these courts mistakenly presume that Section 245(b)(2)(B)'s prohibition against racial violence is narrowly tailored at protecting a victim's civil freedom to use a public facility or benefit. But that is not so. As explained, *supra* Sec. I.E.i., Section 245(b)(2)(B) simply requires the government to show that a perpetrator's conduct was *motivated* by a victim's race and use of a public facility—not that the preparator sought to deny the victim the right to use a public facility. And again, looking to the statute as applied, there is no evidence that Leahy sought to deny J.T. the use or enjoyment of Starkey Road. *See id.* Thus, even under *Jones*, the Court should conclude that Section 245(b)(2)(B) is an unconstitutional exercise of Congress's Thirteenth Amendment authority, either facially or as applied to Leahy's conduct.

II.    **The District Court Erred by Failing to Instruct the Jury on the Specific Intent to Deprive a Victim of the Use of a Public Facility, Declining to Instruct the Jury on the Theory of Defense, and Refusing to Answer the Jury's Question about Starkey Road.**

a. **Section 245(b)(2)(B) Is Limited to Acts Against a Victim Based on a Victim's Membership in a Protected Category and on His/Her Use of a Public Benefit or Facility.**

Should this Court conclude that Section 245(b)(2)(B) is constitutional, for similar reasons discussed above, the Court should adopt a narrow reading of statute that reflects Leahy's position that the statute has "a specific intent requirement, the intent to punish or prevent or dissuade the victim from using the public facility." Doc. 84 at 166.

To explain, Section 245(b)(2)(B) prohibits violence against "any person because of his race…," and "because he is or has been. . .participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof." The key statutory term here is the meaning of "because" in the last clause about enjoying a public facility.

The ordinary meaning of "because," or "because of," is "by reason of or on account of." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1739 (2020) (cleaned up). The Supreme Court has consistently interpreted this language "to invoke "the 'simple' and 'traditional' standard of but-for causation." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2209 (2023) (Gorsuch, J., concurring) (quoting *Bostock*, 140 S. Ct. at 1739); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570

38

U.S. 338, 356 (2013); *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 176 (2009). But that is not the end of the story.

Section 245(b)(2)(B) uses "because" twice in the statute, signifying two causation requirements—the defendant's actions were caused by the victim's (1) race; and (2) use of a public facility. Understanding the causal connection about victim's race is a simple idea to comprehend using the "but-for" test. Saying a race is a "but for" cause means that a defendant was motivated by racial animus.

The causal link involving a public facility, however, is unclear when explaining it in terms of the basic "but-for" standard. For example, as the jury itself questioned, is it enough that a victim is attacked while using a public facility for it to be a "but-for" cause? What does it mean to be motivated by a victim's use of a public facility? Does simply hating that a victim uses or has used a public facility suffice as a but-for cause?

These questions call for a precise interpretation of "because" that harmonizes the "but for" standard with the statute's presumed constitutional purpose, to protect a victim's right to "participat[e] in or enjoy[ ] any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof." § 245(b)(2)(B). The "because" causal connection should be narrowly tailored to instances when a defendant intends to deprive a victim the right to enjoy a public facility or benefit, and not simply because of animus towards a victim for having used a public facility or, as the jury wondered here, the happenstance that a victim is using a public benefit. *See Nelson*, 277 F.3d at 189. This narrowing not only aligns with Congress's

Section 2 authority to protect against denials of individual freedoms, but it also clarifies the "but-for" standard that Congress intended when drafting Section 245(b)(2)(B) with a dual causation requirement to create a statute of limited application for egregious conduct that deprives persons of their civil rights, instead of a general assault statute. *See id.*

Thus, the causal relationship between a defendant's conduct and a victim's use of a public facility cannot be adequately conveyed into a mens rea showing without specifying that a defendant must have had the specific intent to deny a victim the right to use a public facility. Accordingly, the Court should conclude that the district court erred in refusing to instruct the jury that it had to find that Leahy had the specific intent to punish, prevent, or dissuade J.T. from using Starkey Road.

### b. The District Court Should Have Instructed the Jury on Leahy's Theory of Defense that J.T.'s Use of Starkey Road Did Not Cause his Conduct.

Assuming, however, the district court did not err by instructing the jury using the standard "but-for" instruction, it still abused its discretion by failing to instruct the jury on Leahy's theory of defense. "A criminal defendant has the right to have the jury instructed on her theory of defense, separate and apart from instructions given on the elements of the charged offense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995) (citing *Opdahl*, 930 F.2d at 1530). "A trial court may not refuse to charge the jury on a specific defense theory where the proposed instruction presents a valid defense and where there has been some evidence adduced at trial relevant to that defense." *Id.*

(citing *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982)). A district court's refusal to deliver a requested instruction is reversible error if the instruction "(1) is correct; (2) is not substantially covered by other instructions which were delivered; and (3) deals with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendant's ability to defend." *Id.* (quoting *Opdahl*, 930 F.2d at 1533 (quotations and citation omitted)).

Here, all the conditions for providing a theory of defense instruction were met. As for the correctness of the requested instruction, Leahy's theory was that he "would have behaved in the same way he did on the night in question even if J.T. had not used Starkey Road." Doc. 84 at 167. This instruction fits the "but for" standard because it negates the causal connection the government had to show between Leahy's actions and J.T.'s use of a public facility.

The basic "but-for" instruction, however, did not adequately capture Leahy's theory of defense. The district court instructed the jury that the public facility "in this case" was "Starkey Road." Doc. 85 at 19–20. And then the district court instructed the jury that it had to determine "that the Defendant would not have acted as he did but-for J.T.'s use of that facility," meaning but for using Starkey Road. *Id.* at 20. The court further instructed the jury that "you may find this element is satisfied…so long as you find that the Defendant would not have acted as he did in the absence of J.T.'s use of that facility," once again meaning Starkey Road. *Id.* But the court did not instruct the

41

jury that evidence that Leahy "would have behaved in the same way" without J.T.'s use of Starkey Road negates causation.

As for evidence supporting Leahy's theory of defense, witnesses testified that Leahy said nothing about Starkey Road before, during, or after his altercation with J.T. *See* Doc. 84 at 67, 90, 99, 117, 128, 139. Second, Leahy made statements to the police: "damn, I wish I had money. If I had money I wouldn't have been out here f—kin, fighting with random dudes in a f—king, in a car, drunk." These statements support that the cause for his actions was unrelated to J.T.'s enjoyment of Starkey Road, but linked to Leahy's drinking and ultimately his own act of random violence. Doc. 78-2. Third, there was countervailing evidence that Leahy had no intention of keeping J.T. from using Starkey Road (or any public facility), including his having passed J.T. by when J.T. pulled over on the side of Starkey Road. *See* Doc. 115 at 7-8.

Furthermore, as for whether the requested instruction dealt with a vital trial issue, Leahy's entire trial was about whether he acted "because" of J.T.'s enjoyment of Starkey Road. Leahy's cross-examination centered largely on the lack of evidence supporting that Starkey Road caused his conduct. Moreover, both the government's and defense's closing arguments almost exclusively focused on whether Leahy acted "because" of Starkey Road. *See* Doc. 84 at 180–197. Additionally, both sides argued over jury instructions involving Starkey Road. And the jury, too, focused on and was confused about whether "the fact that both parties were on the road at the same time suffice part four of [the] charges?" Doc. 76 at 5; Doc. 86 at 11.

42

The standard "but for" instruction did not convey Leahy's defense that Starkey Road was not a cause, "but for" or otherwise, for his actions. The instructions given did not clarify that J.T.'s mere presence on, or the happenstance of him traveling on Starkey Road, was inadequate to support that Leahy acted "because" of J.T.'s use of Starkey Road. Thus, providing the jury with only the standard "but for" instruction without Leahy's theory of defense created the substantial risk that the jury misunderstood the causal connection it had to find to support a conviction and deprived Leahy of a fair opportunity to present his valid defense.

### c. The District Court Abused its Discretion by Refusing to Answer the Jury's Question about the Causal Connection between Leahy's Actions and Starkey Road.

Even if the jury was correctly instructed, the district court still erred by failing to answer the jury's question about Starkey Road and the evidence required to show "but for" causation on the public facility element. "When a jury makes explicit its difficulties," a district court "should clear them away with concrete accuracy." *Bollenbach v. United States,* 326 U.S. 607, 612–13 (1946); *see also United States v. Joyner*, 882 F.3d 1369, 1375 (11th Cir. 2018) ("When a jury requests supplemental instruction, a district court should answer within the specific limits of the question presented and resolve the jury's difficulties with concrete accuracy."). "While the district court has considerable discretion regarding the extent and character of supplemental jury instructions, it does not have discretion to misstate the law or confuse the jury." *Lopez*, 590 F.3d at 1247–48; *see also United States v. Gumbs*, 964 F.3d 1340, 1350 (11th Cir. 2020).

43

Here, after telling the court that it was deadlocked on the charges, the jury asked for clarification on the issue that went to the heart of the trial: "Does the fact that both parties were on the road at the same time suffice part four of [the] charges?" Doc. 76 at 5; Doc. 86 at 11. This question asks whether "but-for" causation is satisfied simply because Leahy assaulted J.T. while the two were on Starkey Road. The answer is "no," because under this scenario there is no showing of causation. To say otherwise is the classic fallacy, post hoc ergo propter hoc, which assumes that when two events occur at the same time, then one must have caused the other. The jury's question thus signals its difficulty understanding the "but-for" instruction and the causation it had to find to support that Leahy targeted J.T. "because" J.T. used Starkey Road.

While the jury instructions defined "but for" causation, they did not clarify the predicate about what constitutes cause and effect. The jury thus understandably asked for clarification. But the court refused to provide clarity, and its reasoning for doing so was flawed. First, the court said it could not answer the question because the jury was "asking us to answer what they have been asked to answer." Doc. 86 at 11. But, as defense counsel explained, the jury's question "would be insufficient as a matter of law." *Id.* And district court's instruct juries on questions of law all the time, like on willful ignorance, good faith, entrapment, and mistake of fact. So even if it was true that the jury asked a question it was tasked with answering, the district court should have informed the jury that, as a matter of law, the mere fact that Leahy and J.T. were on Starkey Road at the same does not establish causation.

44

Second, the district court refused to answer the question, suggesting that it was unclear what the jury was asking. *Id.* at 12. But the jury's question could not have been more straightforward. All it wanted to know was whether the fact that Leahy and J.T. were on Starkey Road at the same time met the causation requirement. It is really that simple, and the district court never explained why it believed the jury's question was complex, apart from saying, "we are assuming that the question is asking something that we think it's asking." *Id.* Yet it is hard to come up with a clearer way for the jury to have asked this question, and it is not as if the jury's question calls for any assumptions or invites speculation. Again, they just wanted to know if Leahy and J.T. being on Starkey Road at the same time established causation.

To be sure, the district court invited the jury to ask a different question to see if the court could give an answer. But given that the jury's question was so basic to begin with, the district court's suggestion to rephrase the question was basically a non-response.

True enough, "[t]hat there was no further inquiry after the judge's response to the note indicates that the judge's response cleared the jury's difficulty with concrete accuracy." *United States v. Baston*, 818 F.3d 651, 661–62 (11th Cir. 2016) (cleaned up). But it's hard to see how the court's response could have cleared the jury's difficulty since the court did not answer the question, or even direct the jury back to the original instructions. Rather, given that the jury came back about a half hour after the court's response with a split verdict that itself is conflicted with a finding that Leahy acted

"because" of J.T.'s use of Starkey Road, the better inference is that the jury essentially threw up its hands when the court failed to answer its basic question.

Both counts comprised of fundamentally the same conduct, with count one focusing on Leahy's actions inside his vehicle and count two dealing with his conduct outside his car. During both instances Leahy hurled racial slurs at J.T. and attacked J.T. while he was on Starkey Road. So if Leahy acted "because" of J.T.'s use of Starkey Road in count one, he necessarily acted "because" of J.T.'s use of Starkey Road on count two. Because the only real dispute at trial was whether Leahy acted "but for" and "because" of J.T.'s use of Starkey Road, in light of the *Allen* charge and the jury's Starkey Road question, the better inference is once the court refused to answer its question, the jury simply issued a split, inconsistent verdict to overcome its deadlock and confusion about the Starkey Road causal element.

* * *

Each of the errors involving the jury instructions standing alone constitutes reversible error. If, however, the Court is left with any doubt, "the cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (cleaned up). Thus, whether considered alone or in the aggregate, the district court's errors relating to its instructions to the jury and response to the jury's question warrants remand for a new trial.

46

### III. The District Court Erred by Denying Leahy's Motions for a Judgment of Acquittal and New Trial.

Accepting all other rulings were correct, the evidence was nonetheless insufficient to support the verdict on count one. The sufficiency of the evidence boils down to Section 245(b)(2)(B)'s fourth element—whether there was enough evidence to find that Leahy acted "because J.T. was enjoying the use of a facility provided by a state or local government – in this case, Starkey Road." Doc. 77 at 9.

As an initial point of clarification, because both the indictment alleged and the jury instructions defined the public facility as Starkey Road, to convict Leahy, the government had to prove beyond a reasonable doubt that Starkey Road was a "but-for" cause of Leahy's conduct. The district court correctly rejected the government's request for an instruction that it "need not prove the use of Starkey Road specifically…," because, as defense counsel explained, that instruction would constitute "a constructive amendment to the indictment." Doc. 84 at 206–07.

If there is any doubt about the government's burden of proof on the fourth element, the court's instructions said that the jury had to determine "that the Defendant would not have acted as he did but-for J.T.'s use of *that facility*." *Id.* at 10; Doc. 85 at 20 (emphasis added). "That facility" is repeated in the instructions, stating that "you may find this element is satisfied even if the Defendant had additional reasons for his actions so long as you find that the Defendant would not have acted as he did in the absence of J.T.'s use of *that facility*." *Ibid.* (emphasis added). By defining "that facility" as Starkey

47

Road, the instructions provided that the jury had to find that Leahy would not have acted "but-for" J.T.'s use of Starkey Road specifically.

As for the weight of the evidence, the district court recognized this was "not a real, real strong case," but nonetheless pointed to evidence that Leahy "wanted to keep them, referring to blacks, in their area," as the basis for denying a judgment of acquittal. Doc. 84 at 168. The court reasoned that this single statement suggested Leahy "wanted to keep the blacks in their area," and the "jury could conclude" Leahy "conversely [ ] want[ed] to keep" black people like J.T. "out of places other than their area," like "public highways including Starkey Road." *Id.* at 169–70.

But Leahy's statement, even in the light most favorable to the government, does not support an inference that Leahy wanted to keep J.T. out of a public facility, in this case Starkey Road. First, Leahy's statement was: "These, these guys are animals, you know what I'm saying? Ya'll have to maintain these people, keep them in their, in their areas." Doc. 82-2. Leahy made this statement while falsely claiming to the police that J.T. attacked him first, trying to explain why J.T. would do such a thing. *See id.* In this context, Leahy's statement has nothing to do with keeping black people out of any public facility, let alone Starkey Road. Rather, he is trying to convince the police falsely that J.T. randomly attacked him.

Second, taking the "keep them in their…areas" comment at face value, Leahy was still not saying that *he* wanted to keep black people in their areas; he was telling the police *they* had to maintain "these people." Subtle as the distinction may be, it is enough

48

to undermine a fair inference that his comment showed an intent to keep black people, or J.T., out of Starkey Road.

Finally, there was no evidence that Leahy said anything about Starkey Road before, during, or after his altercation with J.T. *See* Doc. 84 at 67, 90, 99, 117, 128, 139. In fact, there was no evidence Leahy tried to keep J.T. from using Starkey Road, or any road for that matter, as the district court recognized at sentencing. *See* Doc. 115 at 8. Thus, a judgment of acquittal was justified because there was no evidence that Leahy was motivated by J.T.'s use of Starkey Road, or that Leahy's conduct that night had anything to do with Starkey Road other than the happenstance that both men were on the road at the same time. But that is not enough to support the causation requirement for the fourth element. Consequently, a judgment of acquittal should have been granted.

Even if a judgment of acquittal was unwarranted, the district court should have granted Leahy's motion for a new trial. *See Martinez*, 763 F.2d at 1312. If the court concludes that "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.* (internal citation and quotation marks omitted).

While new trials are rarely granted, one is warranted here because of all the confusion surrounding the causation element involving Starkey Road—which was the basis of the whole trial. By the court's own recognition, the threshold for overcoming

a judgment of acquittal was based on single statement about keeping black people in their areas, which, as explained, was made in a different context and not about Starkey Road. In other words, this was far from a strong case on whether Leahy acted "but-for" J.T.'s use of Starkey Road. Accordingly, the parties presented competing understandings of what exactly the jury had to find to conclude the government met its burden on the fourth element. Yet that issue was never really cleared up completely through the jury's deliberations. Because of the dearth of evidence supporting causation, and the clear confusion on the jury's end about what it had to find to meet the causation element about Starkey Road, the interests of justice support granting a new trial with guidance from this Court on the appropriate standard the government must meet to show causation on Section 245(b)(2)(B)'s fourth element.

## CONCLUSION

For the above reasons, Leahy's judgment should be vacated.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

*/s/ Adeel Bashir*
Adeel Bashir, Esq.
Assistant Federal Defender
Senior Appellate Attorney
400 N. Tampa Street, Suite 2700
Tampa, FL 33602
Telephone: 813-228-2715
Facsimile: 813-228-2562
E-mail: adeel_bashir@fd.org

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief has 12,908 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

## CERTIFICATE OF SERVICE

I certify that on August 14, 2023, a true and correct copy of the foregoing brief was filed using CM/ECF that will automatically send a copy of this document to Assistant United States Attorneys Janea L. Lamar, Sydney A.R. Foster, and Erin H. Flynn.

*/s/ Adeel Bashir*
Adeel Bashir
Counsel for Appellant